**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | ) |
| | ) |
| GA VIEWS MANAGEMENT, LLC | ) Case No. 24-00339-ELG |
| | ) |
| Debtor. | ) |
| | ) |

**OPPOSITION TO MOTION TO DISMISS**

PV Georgia Views LLC ("Lender"), a secured creditor of Debtor GA Views Management LLC ("Debtor"), hereby objects to Debtor's Motion to Dismiss (the "Motion") (Doc. No. 80), respectfully showing the Court as follows:

Debtor requests that the Court dismiss this case to allow Debtor to file a new chapter 11 case, seeking a do-over aimed at stripping Lender of the remedies agreed to by Debtor and granted by the Court. The Motion conveniently omits any discussion of cause for dismissal or how the outcome of a new chapter 11 case will be any different. A new case will not change the debt owed to Lender (which continues to accrue default rate interest) or the Debtor's income. In short, neither the previous plan proposed by Debtor nor any plan proposed in a new case will be feasible. Further, despite having years to either refinance or sell the property, and over five months in this case to do so, Debtor contends, without any support or evidence, that a new filing will enable Debtor to accomplish a sale or refinance. In short, the Motion is nothing more than a continuation of Debtor's efforts to delay and obstruct Lender in exercising its remedies, thereby prejudicing Lender and without any showing of cause by the Debtor and how dismissal is in the best interests of Debtor's creditors, which includes Lender, and the estate.

**FACTUAL BACKGROUND**

<u>A.</u>  The Loan Documents and Defaults

1

1.      Debtor is indebted to Lender pursuant to that certain Promissory Note in the original principal amount of $7,200,000 dated February 19, 2020 payable by Debtor to Lender, as successor in interest to Parkview Financial REIT, LP (as amended and/or modified, the "Note") and that certain Construction Loan Agreement dated February 19, 2020 by and between Debtor and Lender (as amended and/or modified, the "Loan Agreement").

2.      The Note is secured by a first-priority lien on real property and improvements located at 3557-3559 Georgia NW, Washington, DC 20010 (as more particularly described in the Deed of Trust, together with all property securing the amounts owed by Debtor to Lender, the "Property") pursuant to that certain Construction Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated February 19, 2020, executed by Debtor and recorded in Office of the Recorder of Deeds, District of Columbia, Document No. 2020028612 (as amended and/or modified, the "Deed of Trust", together with the Note, and Loan Agreement, the "Loan Documents").

3.      Pursuant to the Deed, Lender has a first-priority security interest in the Property.

4.      Debtor was notified on or about October 20, 2022 that it was in default under the Loan Agreement for failing to make monthly payments as and when due, and failing to pay the entire unpaid principal balance, plus accrued interest thereon and all other amounts owed under the Loan Documents on or before October 19, 2022.

5.      On or about November 15, 2022, Lender notified Debtor that the Property was to be sold at a public sale on December 15, 2022.

6.      Debtor informed Lender it was in the process of seeking to refinance the debt owed to Lender and on or about December 12, 2022, Lender and Debtor entered into a Forbearance Agreement, as amended by the Amended and Restated Forbearance Agreement dated June 10,

2023 (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, Lender agreed to forbear from exercising its rights and remedies through no later than December 10, 2023.

7. Debtor failed to timely pay all amounts owed under the Loan Documents and the Forbearance Agreement. Thereafter, Lender scheduled a foreclosure of the Property for August 29, 2024 and subsequently re-noticed the foreclosure for October 9, 2024.

8. On or about October 4, 2024, Debtor presented Lender with a letter of intent from Sunday Capital (the "October LOI"). A true and accurate copy of the October LOI is attached hereto as Exhibit 1. The October LOI was for a total loan amount of $7,750,000 at 11.5%, which was insufficient to pay Lender's debt and required costs of $30,000, and a hold back of three months of interest.

B. The Bankruptcy Case

9. On October 9, 2024 (the "Petition Date"), the morning of the scheduled foreclosure sale, Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), initiating this proceeding.

10. On or about October 17, 2024, Lender filed a Motion to Prohibit Use of Cash Collateral, for Adequate Protection, and Other Relief (the "Adequate Protection Motion") (Doc. No. 10). On or about November 6, 2024, Debtor filed an Opposition to the Adequate Protection Motion and a Cross-Motion for Use of Cash Collateral (the "Cash Collateral Motion") (Doc No. 20).

11. On November 13, 2024, the Court held a hearing on interim use of cash collateral (Doc. No. 22). At the hearing, Debtor's counsel stated that Debtor intended to sell the Property and would be filing an application to employ a broker to market and sell the Property.

12. On November 14, 2024, the Court entered a consented to Interim Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection and Related Relief and (III) Scheduling a Final Hearing ("First Interim Order") (Doc. No. 23).

13. Paragraph E of the First Interim Order contained certain stipulations, including that as of the Petition Date, Debtor was indebted to Lender without defense, counterclaim, recoupment, or offset of any kind in the total amount of $8,443,865.12, plus Lender's attorneys' fees and expenses, with interest accruing after October 9, 2024, at the non-default *per diem* of $2,229.07 plus default *per diem* of $1,438.89, which was secured by a first-priority lien on the Property. (Thus, interest accrues at $66,872.10 per month at non-default rate, plus $43,166.70 at default rate, for a total of $110,038.80 per month.)

14. Pursuant to the First Interim Order, Debtor had fourteen (14) days after entry of the First Interim Order, or November 28, 2024, to file a written objection with the Court disputing the attachment or perfection of Lender's liens on the Collateral or disputing the Stipulations. Otherwise, the Stipulations would be deemed stipulations and agreements of Debtor. (Doc. No. 23, ¶¶ 17, 18). Debtor did not file a written objection, timely or otherwise (*See generally*, Docket). Thus, the Stipulations are deemed stipulations and agreements of Debtor. (Doc. No. 23, ¶¶ 17, 18).

15. Pursuant to the First Interim Order, Debtor was required to provide the Lender and U.S. Trustee not later than five (5) business days after the Court's entry of the Interim Order, the following: (1) profit and loss statements for Debtor and the Property for the period of January 1, 2023 through November 15, 2024; and (2) bank statements for the period April 1, 2024 through the Petition Date; and (3) bank statements for the period April 1, 2024 through the Petition Date.

(Doc. No. 23, ¶ 15(a).)  Five (5) business days after the Court's entry of the First Interim Order was November 21, 2024.

16. Pursuant to the Interim Order, on or before November 21, 2024, and the twenty-first (21st) day of each month thereafter, Debtor was to provide the Lender and the U.S. Trustee the following: (1) profit and loss statements for Debtor and the Property for the prior calendar month; (2) a current rent roll for the Property; and (3) an accounting of all Cash Collateral actually spent by Debtor in comparison to the projected expenditures set forth in the Budget.  (Doc. No. 23, ¶ 15(b) – (d).)

17. Debtor failed to provide Lender with any of the required documents on or before November 21, 2024.

18. Failure to abide by the terms, covenants, and conditions of the Interim Order constitutes a Termination Event under the Interim Order.  (Doc. No. 23, ¶ 19).

19. On November 25, 2024, the Lender sent written notice of a Termination Event to Debtor and its counsel (the "Termination Event Notice").  The Termination Event Notice was addressed to the principal of Debtor, Hector Rodriguez, and was delivered to Debtor's principal via email and FEDEX, as well as to Debtor's counsel.[1]  A true and accurate copy of the Termination Event Notice is attached hereto as Exhibit 2.

20. On or about December 4, 2024, Lender filed its Motion for Order Confirming that the Automatic Stay has been Modified and Granting Related Relief (the "Comfort Order Motion") seeking an order that pursuant to First Interim Order, the Automatic Stay had been terminated due to Debtor's defaults under the First Interim Order.

---

[1] Paragraph 9 of the Motion incorrectly asserts that the Termination Event Notice was sent only to Mr. Johnson.

21. On December 16, 2024, Debtor filed an Opposition to the Comfort Order Motion (Doc. No. 35), which falsely claimed Debtor had provided information to Lender. Debtor purported to attach correspondence with Lender but none of the correspondence was sent to Lender or its counsel, but instead were only sent to the United States Trustee.

22. On December 18, 2024, the Court held a hearing on the Comfort Order Motion and a continued hearing on the Cash Collateral Motion. At the hearing, the Court determined that, notwithstanding Debtor's failure to comply with the First Interim Order, because Debtor had generally attempted to comply with the reporting requirements contained in the First Interim Order, the Court would give Debtor one last chance to comply.

23. On December 23, 2024, Debtor filed a substitution of counsel (Doc. No. 39).

24. On January 6, 2025, one day before the deadline to pay Lender monthly non-default interest or file a plan that has a reasonable possibility of being confirmed within a reasonable time, Debtor filed unsigned amended schedules D, E/F adding, among other things, purported non-insider unsecured debt (most of which was classified as contingent and/or disputed) and a secured tax claim in the amount of $120,000 (the "Amended Schedules") (Doc. No. 23), Debtor's Disclosure Statement in Support of its Chapter 11 Plan dated January 6, 2025 (the "Disclosure Statement") (Doc. No. 45) and Debtor's Chapter 11 Plan dated January 6, 2025 (the "Plan") (Doc. No. 46).

25. The Plan and Disclosure Statement had numerous issues, including failure to provide for payment of the secured tax claim scheduled by Debtor in the Amended Schedules, failure to provide for payment of Lender's entire claim (ignoring the stipulated amount in the First Interim Order and instead using only the principal amount), and the Plan itself was not feasible. Lender addressed the numerous issues to the Plan in its Stay Relief Motion (as defined below).

26. On January 7, 2025, Lender filed its Status Report (Doc. No. 48) detailing the numerous discrepancies between Debtor's cash collateral reporting, monthly operating reports, and bank statements and hence, Debtor continued to fail to comply with the First Interim Order.

27. On January 8, 2025, the Court held a further hearing on the Comfort Order Motion. Based on the lack of a cash collateral order and Debtor's admitted discrepancies with regards to financial reporting, the Court scheduled a further hearing on the Cash Collateral Motion for January 22, 2025.

28. On January 14, 2025, Lender filed its Proof of Claim (the "Proof of Claim") (Claim No. 1) reflecting that Lender is owed $8,443,865.12 as of the Petition Date, with interest continuing to accrue at the default rate (consistent with Debtor's stipulation in the First Interim Order).

29. On January 17, 2025, counsel to Debtor provided the undersigned with a profit and loss statement for the period April to November 2024, which demonstrated that Debtor did not use cash collateral in accordance with the Budget.

30. On January 17, 2025, Lender filed its Amended Motion for Relief from Stay (the "Stay Relief Motion") (Doc. No. 61) requesting the Court grant it relief from the automatic stay pursuant to 11 U.S.C. 362(d)(3).

31. On January 21, 2025, Lender filed a further Status Report (Doc. No. 62) informing the Court that the Defendant did not use cash collateral in accordance with the Budget.

32. On February 5, 2025, the morning before the hearing on the Stay Relief Motion, Debtor filed an Exhibit & Witness List (Doc. No. 75), which included a Letter of Intent (the "Amres LOI") providing for a loan of up to $8,540,000, conditioned on an appraised value of $12.2 million, 90 days rental stabilization and a certificate of occupancy. As of the date of the

7

Amres LOI, Lender was owed in excess of $8,600,000 and there were unpaid property taxes, which would be required to be paid at closing.

33. On February 5, 2025, the Court held a continued hearing on the Comfort Order Motion and an initial hearing on the Stay Relief Motion (the "Stay Relief Hearing"). Despite having previously admitted that the Plan was unconfirmable, Debtor retracted that statement asserting there were only minor changes that were needed and relied on the Amres LOI to demonstrate a refinance of the Property was possible, especially once the restaurant opened and Debtor started earning maximum rent for the Property. Debtor did not address any sale of the Property.

34. At the Stay Relief Hearing, the Court raised its concerns that (1) the Plan was filed after the stipulated debt and amended schedules were filed yet failed to provide for payment in full of Lender's debt; (2) that Debtor's financials showed that the plan was not feasible; and (3) that the funds contemplated under the Amres LOI are insufficient to pay Lender in full. Ultimately, the Court determined that it was appropriate to grant the Comfort Order Motion rather than hold an evidentiary hearing on the Stay Relief Motion.

35. The Court stated that there were serious feasibility issues with Debtor's plan and expressed doubt that there is ever going to be a way to refinance the Property. The Court also noted that there was no attempt to amend the Plan or the Disclosure Statement to address any of the issues laid out in Lender's Status Report and Stay Relief Motion prior to the hearing, including the fact that the numbers contained in the Plan were inconsistent with the record at the time it was filed.

36. Additionally, the Court made a finding that Debtor's previous counsel, Mr. Johnson, did a disservice to Debtor in this case. Thus, the estate may have a claim against Mr. Johnson, which is an asset that should be administered for the benefit of Debtors' creditors.

37. On February 13, 2025, approximately eighty (80) days after Debtor received the Termination Event Notice, the Court issued the Order Confirming that the Automatic Stay has been Modified and Granting Related Relief (the "Comfort Order") (Doc. No. 79). The Comfort Order found that Debtor failed to comply or failed to timely comply with the terms and conditions of the First Interim Order and, thus, a Termination Event occurred under the First Interim Order. The Comfort Order authorized Lender to exercise its rights and remedies as to the Property.

38. Pursuant to the Comfort Order, Lender scheduled a foreclosure for March 20, 2025.

39. On February 24, 2025, Debtor provided Lender with reporting for January 2025. The reporting reflected that Debtor did not escrow for taxes in January and failed to pay numerous budgeted expenses including payment for the elevator, electricity, gas, and phone bills, which Debtor has now requested to pay in the last week of February.

C. Debtor's Motion to Dismiss

40. On February 19, 2025, after the Court granted Lender relief and after Lender provided notice of the March 20, 2025 foreclosure sale, Debtor filed the Motion requesting that the Court dismiss this case to allow Debtor to file a new chapter 11 case, essentially seeking a do-over to strip Lender of the remedies agreed to by Debtor and granted by the Court and, once again, delay a foreclosure of the Property. It is unclear what reorganization Debtor intends to pursue in a subsequently filed chapter 11 case, as the Motion mentions both a sale of the Property and a refinance, which is exactly what the deficient, unconfirmable Plan proposed.

41. The Motion asserts that Debtor has retained an experienced commercial broker, subject to Court approval, to sell the Property and states that a sale process would run concurrent with attempts to refinance. The Motion does not identify the proposed broker or contain a listing agreement, which Debtor could have executed subject to Bankruptcy Court approval. Nor does the Motion address what happened to the Amres LOI, which Debtor waived around during the Stay Relief Hearing as proof that reorganization was feasible.

42. The Motion does not contain any citation to case law and does not provide any analysis of the relevant factors under Section 1112(b) of the Bankruptcy Code, but instead asserts in a conclusory fashion that cause exists and dismissal is in the best interests of the creditors and the estate. For the reasons set forth below, Debtor's Motion should be denied.

## LEGAL ARGUMENT

43. It is well-settled that a Chapter 11 debtor does not enjoy an absolute right to a dismissal of its bankruptcy. *See In re Kingbrook Dev. Corp.*, 261 B.R. 378, 379 (Bankr. W.D.N.Y. 2001). A debtor may seek dismissal pursuant to Section 1112(b) of the Bankruptcy Code but must satisfy the requirements contained therein. *See In re Schneider*, 2024 Bankr. LEXIS 558 (Bankr. S.D. Ohio Feb. 27, 2024).

44. Section 1112(b) provides, in relevant part, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause." 11 U.S.C. § 1112(b). "Debtor bears the burden to demonstrate that cause exists to dismiss the case and why the requested alternative is in the best interests of creditors and the estate." 7 Collier on Bankr. P. 1112.04. Section 1112(b)(4) contains a nonexclusive list of factors that demonstrate "cause".

45. Once cause is established, a court must either dismiss the case or convert it to chapter 7 and there is no bright-line test to determine which is in the best interest of creditors and the estate. *See In re Fleetstar*, 614 B.R. 767, 781 (Bankr. E.D. La. 2020). Courts have considered multiple factors. *See, e.g., In re BH S&B Holdings, LLC*, 439 B.R. 341, 346-47 (Bankr. S.D.N.Y. 2010).

46. The Motion should be denied simply because Debtor did not set forth any cause or even analyze dismissal vs. conversion. A court shall only dismiss or convert a case if it is in the best interest of creditors and the estate, not the best interest of Debtor.

47. This case has been pending for five months with no progress towards a sale or refinance. At the first hearing in this matter it was represented that Debtor planned to immediately hire a broker with the plan to sell the Property expeditiously. Although that statement was made by Debtor's previous counsel, and the Court has made findings regarding his representation, Debtor remains bound by its counsel's actions and representations to the Court. *See In re Propst*, 637 B.R. 489, 499-500 (Bankr. N.D. Ill. 2022) ("A party who chooses his counsel freely should be bound by his counsel's actions."); *Santiago-Monteverde v. Pereira*, 512 B.R. 432, 445 (S.D.N.Y. 2014) ("Normally, the conduct of an attorney is imputed to his client, for allowing a party to evade the consequence of the acts or omissions of his freely selected agent would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.").

48. Taking into consideration that Debtor hired new counsel in December, Debtor failed to make any forward progress since then. The Plan was filed on the eve of the Section 362(d)(3) deadline and was patently unconfirmable because, among other things, it provided the incorrect amount of Lender's claim and failed to provide for the secured tax claim, which were

11

both clear on the record when the Plan was filed. The Motion does not address why Debtor did not file an application to employ a broker at any time after the hiring of new counsel or contemporaneously with the Plan, which contemplated either a sale or a refinance. There has been no discussion of attempts to refinance throughout the case other than a passing reference to the Amres LOI, which was unsigned and insufficient to pay Lender in full and was filed on the morning of the Stay Relief Hearing.

49. Not only is there no argument or evidence of cause for dismissal, but the Motion also does not explain how a new bankruptcy case would have any change on the outcome. Regardless of a dismissal of this case, the Stipulations are binding, the amount of income realized by the Property will remain the same, and Lender's claim will continue to accrue nondefault and default interest of $110,038.80 per month plus attorney's fees. *See* 11 U.S.C. § 349; *see, e.g., Ladder 3 Corp. v. Musso (In re Ladder 3 Corp.)*, 768 Fed. Appx. 146, 147 (2d Cir. 2019) (agreeing that § 349(b) has no effect on the enforcement of a court ordered stipulation); *United States v. Ramirez*, 291 B.R. 386, 392 (N.D. Tex. 2002). Debtor has insufficient income to pay Lender interest at the non-default rate as required under Section 362(d)(3). All of the reasons that made the Plan not feasible will still be present in a subsequent chapter 11 case. The only effect dismissal and refiling will have is to prejudice Lender and delay the foreclosure.

50. Debtor has been in default under the Loan Documents since October 20, 2022. Lender and Debtor entered into the Forbearance Agreement whereby Lender forbear from exercising its rights and remedies for at least a year. Debtor subsequently defaulted under the Forbearance Agreement and Lender scheduled a foreclosure of the Property for August 29, 2024, and subsequently re-noticed the foreclosure for October 9, 2024. Despite the nearly two years

during which Lender did not exercise its rights, Debtor was unable to refinance or sell the Property and filed the current case on the eve of the October 9th foreclosure.

51. Debtor then remained in chapter 11, with the protection of the automatic stay, for approximately five months while continually violating the First Interim Order, failing to move the case forward, and filing an admittedly unconfirmable Plan. Lender has been delayed in exercising its rights and remedies for long enough and allowing Debtor to dismiss this case only to file another chapter 11 petition on the eve of the March 20, 2025 foreclosure sale when any case filed by Debtor has no prospect of success is inequitable and unfairly prejudicial to Lender. Not only is Lender unfairly delayed (again), but each time Lender is forced to readvertise a foreclosure sale it costs Lender approximately $10,000.

52. Assuming the Debtor can show cause, conversion is in the best interests of the creditors and the estate. First, it is clear that there is no prospect of reorganization for the Debtor. Filing a new case will not change the debt (which continues to accrue) or Debtor's income or provide Debtor any new avenue to refinance or sell. Second, there are assets that should be administered by a chapter 7 trustee for the benefit of creditors. These assets include the potential malpractice claim against Debtor's previous counsel, which should be administered in a manner in which the Court retains authority to approve the asset's ultimate disposition. *See Kingbrook*, 261 B.R. at 379 (refusing to dismiss a case when Debtor held a lender liability claim, which should be administered for the benefit of Debtor's creditors). Further, the malpractice claim arguably only exists if the Chapter 11 Case remains pending.

53. Additionally, allowing Lender to foreclose will deal with the tax claims against Debtor as Lender will have to pay them after foreclosure. Additionally, Debtor has always asserted

equity in the Property and if there is any surplus from the foreclosure sale it would go back to the chapter 7 estate to be distributed in accordance with the bankruptcy code.

54. The Motion should be denied because Debtor did not meet its burden of proof as to whether there is cause for dismissal and did not analyze whether dismissal or conversion is in the best interest of Debtor's creditors and the estate. Furthermore, a new case will not be any different, it cannot change the debt owed to Lender (which continues to accrue default rate interest) or the Debtor's income. Debtor contends that a new filing will allow it to reorganize but a new filing will not enable Debtor to refinance or sell the property, which it has been trying to do for years. If the Court is to find cause, conversion is in the best interest of the Debtor's creditor and the estate.

## CONCLUSION

WHEREFORE, Lender respectfully requests that this Court deny the Motion or, alternatively, convert the case to one under chapter 7, and grant Lender such other and further relief as is just and proper.

Respectfully submitted, this 3rd day of March, 2025.

By: */s/ James Van Horn*
James E. Van Horn
D.C. Bar No. 999859
JVanHorn@btlaw.com
BARNES & THORNBURG LLP
555 12th Street, NW, Suite 1200
Washington, D.C. 20004
Phone: (202) 371-6351

*s/ Lisa Wolgast*
Lisa Wolgast (admitted *pro hac*)
Georgia Bar No.: 773399
Lisa.Wolgast@btlaw.com
BARNES & THORNBURG LLP
3340 Peachtree Road, NE
Suite 2900
Atlanta, GA 30326-1092
Phone: (470) 832-7537

*Attorneys for PV Georgia Views LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | ) |
| | ) |
| GA VIEWS MANAGEMENT, LLC | )   Case No. 24-00339-ELG |
| | ) |
| Debtor. | ) |
| | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I filed a true and correct copy of the foregoing *Opposition to Motion to Dismiss* with the United States Bankruptcy Court for the District of Columbia using the Court's CM/ECF system, which will serve notice of such filing to all counsel of record.

Dated: March 3, 2025

By: */s/ James Van Horn*
James E. Van Horn